**STATE**

v.

**Gary L. LOCKE.**

**No. 79–418–C.A.**

Supreme Court of Rhode Island.

Aug. 13, 1980.

---

Dennis J. Roberts, II, Atty. Gen., Michael J. McEntee, Sp. Asst. Atty. Gen., for plaintiff.

Aram K. Berberian, Warwick, for defendant.

## OPINION

BEVILACQUA, Chief Justice.

The defendant was found guilty by a trial justice of the Superior Court, sitting without a jury, of driving under the influence of alcohol pursuant to G.L.1956 (1968 Reenactment) § 31–27–2, as amended by P.L.1974, ch. 120, § 2. He has now appealed to this court from the judgment of conviction.

The facts are not in substantial dispute. Charlestown police officer Donald Middlebrooks arrested defendant in the early morning hours of November 14, 1976. While leaving the Charlestown Town Hall parking lot, the police officer observed a man in a motor vehicle stopped in the northbound lane of Route 2 "revving up" the engine. The officer stopped his vehicle behind the other vehicle. Presently the party under observation spun the wheels of his car and slid the car across the center line of the highway.

After stopping the vehicle, the driver backed up and repeated this action of spinning the car's wheels. Upon moving alongside the motor vehicle, the police officer trained his strobe light on the automobile to indicate that he wanted the operator to pull the car over to the side of the road. Officer Middlebrooks observed defendant, Gary L. Locke, behind the wheel of the motor vehicle. Instead of pulling to the side of the road, the operator of the motor vehicle drove off and in the process spun the car wheels for a third time. The officer gave chase in his patrol car, sometimes reaching

speeds of ninety miles per hour. The pursued vehicle, at times crossing the center line, was driven in an erratic manner. When they came to the town line at Richmond, the officer, fearing the dangers involved, discontinued pursuit.

At approximately 1:50 a. m. of the same day, Officer Middlebrooks, while checking a stopped motor vehicle on Shannock Road, observed a Plymouth Duster drive up behind his police cruiser. He immediately recognized the car as the same motor vehicle to which he had previously given chase. The automobile stopped and defendant alighted. Locke staggered and almost fell. He approached the police officer and spoke to him in a loud voice, slurring his words. Observing the condition of defendant, the officer placed Locke under arrest for driving under the influence and advised him of his *Miranda* rights. The officer then placed defendant in the police cruiser and transported him to the town of Westerly to administer a breathalyzer test to him. At trial the officer explained that the reason he took defendant to Westerly was because Charlestown did not have breathalyzer equipment. A police officer of the town of Westerly performed the test on defendant in Westerly.

Prior to taking the test, the police, in accordance with G.L.1956 (1968 Reenactment) § 31–27–2.1, as amended by P.L.1978, ch. 174, § 1, advised defendant of his rights under that section and further advised him that refusal to submit to the test would result in a mandatory fine and a possible suspension of his driver's license. The defendant signed a consent form and submitted to the test. The test results were consistent with a finding of intoxication. Before trial defendant filed a motion to suppress the results of the test on the ground that the threat of license suspension coerced him into submitting to the test and rendered his consent involuntary. Because the charge was tried without a jury, the trial court permitted defendant to proceed to trial before the court had ruled on his motion to suppress; the trial justice heard argument on defendant's motion after the close of evidence. On direct examination

defendant conceded the legality of the initial arrest, but he testified that he had submitted to the breathalyzer test only because of the threat of license suspension. He claimed that the test as administered was therefore an unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments of the Federal Constitution, and art. I, sec. 6 of the Rhode Island constitution.

In further support of his motion to suppress defendant argued that when Officer Middlebrooks transported him from the town of Charlestown to the town of Westerly, the officer lost his authority as a police officer to hold him under arrest. As a result, the fruits of the illegal arrest, he claimed, were constitutionally infirm and, therefore, inadmissible in evidence.

The trial justice denied the motion to suppress and found defendant guilty as charged. The defendant then filed an appeal with this court.

In support of his contention that the breathalyzer test was an unlawful search and seizure the results of which should have been excluded from evidence at trial, defendant in this court presses two theories: (1) that at the time the police conducted the breathalyzer test they held him under an unlawful arrest and, therefore, searched him in violation of the Fourth and Fourteenth Amendments of the Federal Constitution and art. I, sec. 6 of the Rhode Island constitution, and (2) that the implied–consent law, G.L.1956 (1968 Reenactment) § 31–27–2.1, which threatens suspension of the driver's license of any person suspected of driving under the influence of intoxicating liquor who withholds his consent to a test of his breath, blood, or urine conducted for the purpose of ascertaining his blood–alcohol level, places an unconstitutional condition on the exercise of his federally and state guaranteed immunity from unreasonable searches and seizures.

I

The taking of blood, breath, or urine samples from a suspect is a search

and seizure under the Fourth Amendment and R.I.Const., art. I, § 6. *State v. Bentley,* 92 Wis.2d 860, 863, 286 N.W.2d 153, 155 (1979); *see Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Initially we recognize the settled rule that "a search conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well–delineated exceptions.'" *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 858 (1973). Ordinarily the police obtain search warrants before searching a dwelling and, absent exceptional circumstances, "no less could be required where intrusions into the human body are concerned." *Schmerber v. California,* 384 U.S. at 770, 86 S.Ct. at 1835, 16 L.Ed.2d at 919. Rhode Island law recognizes that two of the specifically established exceptions to the requirements of both a warrant and probable cause include a search incident to a lawful arrest, *State v. DeWolfe,* R.I., 402 A.2d 740, 742 (1979); *see United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and a search conducted pursuant to consent. *State v. Leavitt,* 103 R.I. 273, 237 A.2d 309 (1968); *see Schneckloth v. Bustamonte,* 412 U.S. at 219, 93 S.Ct. at 2043, 36 L.Ed.2d at 858.

The defendant first contends that once Officer Middlebrooks transported him outside Charlestown, the officer no longer had the authority to hold him under arrest; therefore, because the breathalyzer test was administered when he was unlawfully arrested, its results were inadmissible in evidence. In support of his argument defendant relies wholly on *Page v. Staples,* 13 R.I. 306 (1881), where, in an action for trespass for assault and false imprisonment, the defendant, Staples, a Providence County sheriff, transported Page, his prisoner, through a part of Kent County on his way to admitting Page to bail at the Providence County jail. The court held that "[i]n the absence of statutory provisions, the power of a sheriff is limited to his own county." *Id.* at 307; *accord, e. g., Zanks v. Fluckiger,* 22 Conn. Supp. 311, 171 A.2d 86 (1961); *State v. Shienle,* 218 Kan. 637, 545 P.2d 1129 (1976);

*City of Fairborn v. Munkus,* 28 Ohio St.2d 207, 277 N.E.2d 227 (1971); *Irwin v. State, Dept. of Motor Vehicles,* 10 Wash.App. 369, 517 P.2d 619 (1974). We further said in *Page* that if a peace officer conducts a prisoner outside his own county, he then becomes a trespasser. *Page v. Staples,* 13 R.I. at 307. The only exceptions to this principle noted in *Page* were these: when a peace officer, acting under the authority of a writ of habeas corpus, conducts a prisoner in custody pursuant to the writ through other counties to return the prisoner to the place where the writ is returnable and when an officer, upon fast pursuit, retakes a prisoner who has escaped from his custody into another county. *Id.* at 307–08; *accord, e. g., United States v. Getz,* 381 F.Supp. 43 (E.D.Pa.1974); *State v. Terracina,* 309 So.2d 271 (La.1975); *Commonwealth v. Robb,* 238 Pa.Super. 62, 352 A.2d 515 (1975).

The *Page* case is distinguishable from the instant case. Instead, our ruling in *Cioci v. Santos,* 99 R.I. 308, 207 A.2d 300 (1965), controls the issue before us. In *Cioci* after the plaintiff attempted suicide the arresting officers of the town of Cumberland took him for treatment to a hospital in the city of Providence. We held that "the dictates of public policy require * * * that police officers who have a citizen in their lawful custody be not deterred from acting to protect the well–being of such person, particularly in circumstances arising out of an emergency such as existed in the instant case." *Id.* at 315, 207 A.2d at 304.

In *Page* the travel in another county was for the convenience of the defendant–sheriff and not as part of the sheriff's duties. In the instant case, as in *Cioci,* an emergency existed that impelled the officer to carry the suspect outside of his jurisdiction. Officer Middlebrooks acted to protect the public from a drunken driver and to protect Locke from himself. Under the circumstances public policy required the officer, in carrying out his duties, to administer a breathalyzer test so that he could intelligently decide whether to remove defendant from the highway because of his condition.

*See Descoteaux v. Bonaventura*, 115 R.I. 555, 350 A.2d 396 (1976); *Cioci v. Santos*, 99 R.I. at 315, 207 A.2d at 304; *Yekhtikian v. Blessing*, 90 R.I. 287, 157 A.2d 669 (1960).[1]

The travel to Westerly was not merely for the convenience of the arresting officer. An emergency did exist; the test had to be given without delay. To allow the delay would have in time resulted in the elimination of the traces of alcohol in Locke's blood. *Schmerber v. California*, 384 U.S. at 770–71, 86 S.Ct. at 1835–36, 16 L.Ed.2d at 919–20; *State v. Bentley*, 92 Wis.2d at 863, 286 N.W.2d at 155. For the protection of the public the police promptly administered the breathalyzer test to decide whether defendant was a potentially dangerous operator who had to be removed from the highway.

We therefore conclude that the police officer, under these circumstances, was justified in carrying defendant outside his municipality and did not lose custody of defendant. Accordingly, the police conducted the breathalyzer test pursuant to a lawful arrest. *See Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. Thompson*, 356 F.2d 216, 224–25 (2d Cir. 1965) (fingerprint evidence obtained pursuant to a valid arrest).

## II

Locke next claims that in the absence of a warrant issued on probable cause the police conducted a search of his body without his voluntary consent and obtained breath samples, the records of which were admitted in evidence against him. Attacking the voluntariness of his consent to the search, defendant contends that he consented to the search only because the police had informed him that if he refused to submit to the test, his driver's license could be suspended by operation of G.L.1956 (1968 Reenactment) § 31–27–2.1. The threat of los-

ing his license, he argues, coerced him into taking the test, thereby rendering his consent involuntary. Locke complains of no other form of coercion but confines his challenge of the constitutionality of the search to the threat of license revocation built into the statutory scheme. The exercise of his right to refuse the breathalyzer search, he claims, cannot, in consistency with the Fourth Amendment guarantees, be conditioned on the forfeiture of his driver's license.

Faced with a claimed Fourth Amendment violation in circumstances similar to the one before us, although not involving the operation of an implied–consent statute, the United States Supreme Court upheld a compelled search of a defendant's body as reasonable under the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Reasoning that "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner," the Court found that the taking of a blood sample from a defendant suspected of driving under the influence of intoxicants was both justified in the circumstances and conducted according to reasonable procedures. *Id.* at 768, 86 S.Ct. at 1834, 16 L.Ed.2d at 918. The Court noted that the facts that established probable cause to arrest a suspect for driving under the influence of intoxicants also established probable cause to search him for evidence of crime. *Id.* at 770, 86 S.Ct. at 1835, 16 L.Ed.2d at 919. Concluding that the exigencies of the circumstances militated against the delay involved in obtaining a warrant, the Court left to the police the question of probable cause to search. The Court saw an emergency in the threatened destruction of evidence because "the percentage of alcohol in the blood begins to diminish shortly after

---

1. Several courts have validated the action of police officers who have held defendants under arrest without the territory in which the police were authorized to act as police on the theory that the police had the power to act as private individuals. *See e. g., People v. Monson*, 28 Cal.App.3d 935, 105 Cal.Rptr. 92 (1972); *State v. McCarthy*, 123 N.J.Super. 513, 303 A.2d 626 (1973). We expressly decline to follow this rationale in the case before us.

drinking stops, as the body functions to eliminate it from the system." *Id.*, 86 S.Ct. at 1836, 16 L.Ed.2d at 920. Accordingly, the Court classified the search as "an appropriate incident" to the defendant's arrest. *Id.* at 771, 86 S.Ct. at 1836, 16 L.Ed.2d at 920. The Court finally ruled that the search had been conducted in a reasonable fashion. *Id.*, 86 S.Ct. at 1836, 16 L.Ed.2d at 920.

■ On the operative facts of the case before us, which we believe are indistinguishable from *Schmerber,* one, therefore, cannot argue that the police who conducted a breathalyzer search on Locke subjected him to an unreasonable search and seizure.[2] To say that the search in the case before us was reasonable, however, does not end our inquiry because in Rhode Island certain statutory requirements must be met before the test results may be properly admitted in a trial for driving under the influence.

In *State v. Berker,* R.I., 391 A.2d 107 (1978), we considered an appeal of a conviction for driving under the influence[3] and noted that in driving–under–the–influence trials G.L.1956 (1968 Reenactment) § 31–27–2 controls the admissibility of the results of a breathalyzer test in evidence and that the implied–consent statute, § 31–27–2.1, applies only to administrative license–revocation proceedings. *Id.* 391 A.2d at 112.

Section 31–27–2(b) imposes seven conditions on the admissibility of breathalyzer test results in driving–under–the–influence trials, including the requirement of defendant's actual consent.

"(b) In any criminal prosecution for a violation of paragraph (a) of this section, evidence as to the amount of intoxicating liquor * * * in the defendant's blood at the time alleged as shown by a chemical analysis of the defendant's breath, blood or urine or other bodily substance shall be admissible and competent provided that evidence is presented that the following conditions have been complied with.

(1) The defendant had consented to the taking of the test upon which said analysis is made."

We believe the Legislature included the consent requirement to prevent a violent confrontation between an arresting officer and a suspect unwilling to submit to a test of this sort.

■ In response to defendant's contention that his consent to the test was the product of coercion built into the statutory scheme, we believe that the driving–under–the–influence statute represents a valid exercise of state police power to regulate conduct that by its very nature directly affects the lives, health, and general welfare of the people of the state. *See People v. Brown,* 174 Colo. 513, 522–23, 485 P.2d 500, 505 (1971). The Supreme Court has recognized that when the state seeks to find the level of alcohol in a defendant's bloodstream, "the individual's right to immunity from such invasion of the body as is involved in a properly safeguarded blood test is far out-

---

**2.** The four cases that defendant cites to us in support of his contention that he was unlawfully searched are clearly distinguishable from the *Schmerber* case and the instant appeal. *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), supports the conclusion that this type of search is constitutional; the Supreme Court upheld a search of the defendant's fingernails as an appropriate search incident to a valid arrest. In *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), the Supreme Court found a Fourth Amendment violation in employing unreasonable procedures to obtain fingerprint evidence from the defendant. And at the time the police in *State v. Scanlon,* 110 N.H. 179, 263 A.2d 669 (1970), and *State v. Kroening,* 274 Wis. 266, 79 N.W.2d 810 (1957), conducted blood tests, the

defendants in those cases were not under lawful arrests.

**3.** In *State v. Berker,* R.I., 391 A.2d 107 (1978), we addressed the state's claim that the challenged search in that case was reasonable because conducted pursuant to consent. In light of our application of *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), in the instant case to searches conducted pursuant to our drunk–driving laws, the consent of the suspect is irrelevant to a consideration of the lawfulness of this type of search. Nevertheless, under the statutory scheme the state must obtain a valid consent from a suspect before the evidence seized can be admissible in a driving–under–the–influence trial.

weighed by the value of its deterrent effect due to public realization that the issue of driving while under the influence of alcohol can often by this method be taken out of the confusion of conflicting contentions." *Breithaupt v. Abram*, 352 U.S. 432, 439–40, 77 S.Ct. 408, 412, 1 L.Ed.2d 448, 453 (1957).

The goal of the legislation against drunken driving is to reduce "the carnage occurring on our highways which is attributable to the persons who imbibe alcohol and then drive." *DiSalvo v. Williamson*, 106 R.I. 303, 305–06, 259 A.2d 671, 673 (1969); *accord, Dunn v. Petit*, R.I., 388 A.2d 809, 811 (1978). To accomplish this objective the state seeks to remove from the highway drivers who in drinking become a menace to themselves and to the public. *See, e. g., Campbell v. Superior Court*, 106 Ariz. 542, 546, 479 P.2d 685, 689 (1971).

The penalty of license forfeiture is a nonviolent method of exacting consent to the minimal intrusion necessary to obtain evidence of intoxication. *DiSalvo v. Williamson*, 106 R.I. at 306, 259 A.2d at 673. Moreover, the threatened suspension under the statute is critical to attainment of the goal of making the highways safe by removing drivers who are under the influence. *People v. Brown*, 174 Colo. at 523, 485 P.2d at 505.

■ The state's compelling interest in highway safety justifies the procedure of imposing summary suspension, effective pending the outcome of the promptly available postsuspension hearing, on those who refuse to consent to a test of this type. *See Mackey v. Montrym*, 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979). The statutory suspension provision effectuates the state's vital interest and does not impermissibly impose an element of coercion on the actual consent that defendant must have first given before the test results may be admitted in conformity with § 31–27–2 in a driving–under–the–influence trial. *Cf. State v. Leavitt*, 103 R.I. at 291, 237 A.2d at 319 (sufficient evidence of defendant's voluntary consent to the search of his car).

■ Of course the arresting officer must inform the person under arrest of his *Miranda* rights, of his right to be examined by a physician of his choice, of his right to refuse to submit to the breathalyzer examination, and of the consequences of the failure to consent to the test. *DiSalvo v. Williamson*, 106 R.I. at 305, 259 A.2d at 672. There is, however, no fundamental constitutional right to drive on the highways; it is a right subject to reasonable control and regulation rationally related to legitimate state interests. *See McGue v. Sillas*, 82 Cal.App.3d 799, 805, 147 Cal.Rptr. 354, 357 (1978). The drunk–driving laws are one such reasonable regulation.

■ The police in the instant case in no way prevented Locke from refusing his consent and precluding the admissibility of the test results in evidence. He had a choice; if he chose not to submit to the test, it would not have been given.

Furthermore, the threatened sanctions are not arbitrarily imposed. The statute provides for an administrative hearing at which the defendant had the right to be heard on the issue of his license suspension. *See Mackey v. Montrym*, 443 U.S. at 18, 99 S.Ct. at 2621, 61 L.Ed.2d at 334–35. Under the circumstances of this appeal, we find that the defendant voluntarily and knowingly consented to the breathalyzer test. The results, therefore, were admissible.

The defendant's appeal is denied and dismissed, the judgment of conviction is affirmed, and the cause is remanded to the Superior Court.